Sharon **EAGAN**, an incompetent, by Eugene **KEITH**, her guardian, Plaintiffs,

v.

Barbara **JACKSON**, Cooperative For American Relief Everywhere, a/k/a **C.A.R.E.**, John Doe (name being fictitious) and **ABC CORP.** (name being fictitious), Defendants.

Civ. A. No. 92–533.

United States District Court, E.D. Pennsylvania.

June 13, 1994.

Sheldon Bross, Bross, Strickland, Cary & Grossman, P.A., Newark, NJ, for plaintiff.

Richard A. Kraemer, Marshall, Dennehey, Warner, Coleman and Goggin, John F. Kent, Marks, Kent & O'Neill, P.C., Philadelphia, PA, Edwin R. Matthews, Cuyler, Burk & Matthews, Florham Park, NJ, for defendants.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

Presently before the Court is plaintiff Sharon Eagan's Motion for Approval of the Settlement Agreement and Counsel Fees, filed on her behalf by Eugene Keith, her brother and court-appointed guardian, as well as a Rule to Show Cause issued by the Court. Though approval of the settlement in this case at first appeared to be a relatively uncomplicated exercise, with the plaintiff represented by experienced trial counsel, and with an able guardian in the person of her brother, a licensed, practicing attorney, this case proved once again that things are not always what they seem. The Court will approve the settlement reached by the parties to this action, but not in the form originally proposed, and not without first examining the lapses of both counsel for Plaintiff and the guardian and enforcing the Rule to Show Cause. The Court concludes that: 1) the guardian breached his fiduciary duty of loyalty and, therefore, has forfeited any compensation to which he was entitled under the referral fee agreement between him and counsel for plaintiff, and 2) counsel for the plaintiff breached his duty of candor to the Court and, therefore, his *pro hac vice* admis-

sion will be revoked. The Court will set the maximum appropriate amount of legal fees to which counsel for plaintiff is entitled under New Jersey law and pursuant to the contingency fee agreement between the estate and counsel, but will refer the matter to the New Jersey court with general superintendency over the administration of the estate of Sharon Eagan to consider whether counsel's conduct in: 1) initially entering into an oral contingent fee agreement, 2) promising to pay the guardian a referral fee, and 3) appearing before the New Jersey court and undertaking the representation of the estate in this litigation without disclosing to that court the existence of the referral fee agreement, breached the New Jersey Court Rules and/or the New Jersey Rules of Professional Conduct and, if so, to determine in light of counsel's conduct what fee, if any, counsel should receive in this case, up to the maximum allowed as an appropriate fee by this Court, and whether counsel should be referred to the New Jersey Supreme Court Office of Attorney Ethics. Mr. Keith shall also be referred to the New Jersey court for substantially the same reasons, i.e., his conduct as an attorney prior to the institution of this case.

## I. BACKGROUND

Sharon Eagan was seriously injured in a motor vehicle accident that occurred in Guatemala City, Guatemala, on September 6, 1990.[1] The motor vehicle was owned by defendant Cooperative for American Relief Everywhere ("C.A.R.E."), a New York corporation with its principal place of business in New York, and operated by defendant Barbara Jackson, allegedly a citizen of Pennsylvania.[2] Ms. Eagan suffered severe trauma to her head, resulting in significant cognitive sequelae and some difficulty with physical activities. Her brother, Eugene Keith, traveled to Guatemala to care for her, and accompanied her back to New Jersey, where she and Mr. Keith resided at the time. In New Jersey, Mr. Keith arranged for her medical care and handled her affairs, in consultation with their mother and their brother. Mr. Keith, an attorney licensed by the states of New Jersey and Colorado with over thirty years in practice, had previously represented Ms. Eagan in various legal matters, including motor vehicle cases, landlord-tenant matters, and tax questions. Based on these episodic representations, Mr. Keith believed after Ms. Eagan's accident that he was authorized to act initially as her attorney even prior to formal court appointment of a guardian.

In November or December of 1990, Mr. Keith met with Sheldon Bross, a lawyer licensed to practice in New Jersey and a member of the firm of the New Jersey law firm of Bross, Strickland, Cary & Grossman, P.A. ("Bross, Strickland"), whose practice concentrated in personal injury litigation and who had been an acquaintance of Mr. Keith's for over thirty years since they had attended law school together. Though it is unclear in what capacity Mr. Keith was acting, i.e., lawyer, guardian, or family member, the result of this initial meeting was that Mr. Bross was orally "retained" to represent Ms. Eagan's interests in connection with the personal injury action arising from the events in Guatemala.[3] Mr. Bross and Mr. Eagan agreed

---

**1.** For purposes of ruling in the matter *sub judice* only, the Court accepts the version of the historical facts as represented by Mr. Keith, the guardian, and Mr. Sheldon Bross, plaintiff's counsel, in their affidavits and correspondence submitted to the Court, and in their statements and representations to the Court during the hearings held on October 28, 1993, and February 15, 1994. Defendants have taken no position in this matter, except to say that they believe the settlement proposed is fair and reasonable and should be approved by the Court.

**2.** In her motion to dismiss for lack of personal jurisdiction, Ms. Jackson filed an unsworn affidavit stating that she was a resident of Malaysia, and anticipated future residence in Australia, her husband's place of birth and citizenship. *See* Def.'s Supp. Br. in Support of Mot. to Dismiss exhibit A at 1–2. The issue of her amenability to this Court's jurisdiction was never resolved, since the settlement of the case negotiated by the plaintiff and defendant C.A.R.E. rendered it moot. Her status is relevant in deciding the instant motion only to the extent that it is indicative of the level of uncertainty and complexity present in the personal injury action brought on Ms. Eagan's behalf.

**3.** Though it is not clear what legal authority Mr. Eagan had to retain Mr. Bross, the Court will assume for purposes of this proceeding that Mr. Eagan was acting as a "de facto" guardian at this point. *See* Pa.R.Prof.Conduct 1.14 cmt. ("If

that Mr. Bross would be recompensed on a contingency basis, based upon the permissible fee percentages authorized by New Jersey Court Rule 1:21–7.[4] No written fee agreement was executed by Mr. Bross or Mr. Eagan at that time. *See id.* 1:21–7(g) (requiring a signed fee agreement when the maximum fee percentages outlined in the Rule are used); N.J.R.Prof.Conduct 1.5(c) (requiring that a contingent fee agreement be in writing) [hereinafter N.J.R.P.C.].

Shortly after the oral agreement retaining Mr. Bross was entered into, Mr. Keith received an unsolicited letter from Bross, Strickland, signed by Mr. Bross and dated January 2, 1991, informing Mr. Keith that as a result of having referred the case to Bross, Strickland, he was to receive a referral fee:

> Dear Mr. Keith:
>
> Thank you for the referral of [Sharon Eagan]. As certified civil trial attorneys, we are permitted to forward a one-third referral fee to you upon conclusion of this matter. If at any time you would like to know the status of the case, or have any questions, please feel free to call.
>
> Again, thank you for your kind referral.
>
> > Very truly yours,
> > BROSS, STRICKLAND,
> > CARY & GROSSMAN, P.A.
> > /s/ Sheldon Bross

Response of Sheldon Bross and Bross, Strickland to the Court's Order to Show Cause exhibit 4 [hereinafter "Bross Response"].[5] While both Mr. Keith and Mr. Bross have certified that there was no discussion of a referral fee at their initial meeting, both acknowledge that the initial meet-

ing was in the manner of a referral. *See* Bross Response exhibit 1, ¶ 5 (Affidavit of Eugene Keith) (the "Third Keith Aff.") ("When I initially referred the case to Mr. Bross there was no discussion of a referral fee."); Bross Response exhibit 2, ¶ 7 (Affidavit of Sheldon Bross) (the "Second Bross Aff.") ("As a Certified Civil Trial Attorney, I am authorized to pay a 33⅓% referral fee when a case is referred to me by an attorney. Mr. Keith did not ask for a referral fee."). In short, the result of the initial meeting and subsequent letter between Mr. Bross and Mr. Keith was that Mr. Bross was to receive the fee percentages allowed under New Jersey Court Rule, and Mr. Keith, the referring attorney and apparent de facto guardian, would receive one-third of the fees earned by Mr. Bross.

In October of 1991, nearly a year after the initial Bross–Keith meeting, and as required under New Jersey law, an application for guardianship was filed by Mr. Bross in the Chancery Division of the Superior Court of New Jersey, seeking to have Mr. Keith appointed as Ms. Eagan's guardian. *See* Third Keith Aff. ¶¶ 6–7 (describing Mr. Bross's involvement in the guardianship application process); Second Bross Aff. ¶ 8 (same). The court appointed Joseph Bottitta, Esq., to represent Ms. Eagan in the incompetency proceedings as guardian ad litem. On October 29, 1991, after a hearing at which Mr. Keith did not personally appear, the New Jersey Superior Court declared Sharon Eagan to be an incompetent, and appointed Mr. Keith as guardian of her person and property. The court retained jurisdiction over the estate, ordering that Mr. Keith apply for a bond,

---

[a client with a disability] has no guardian or legal representative, the lawyer often must act as de facto guardian."); N.J.R.Prof.Conduct 1.14 cmt. (same); *see also Miske v. Habay,* 1 N.J. 368, 63 A.2d 883, 885 (1949) (holding that de facto guardians are "accountable in Chancery as constructive trustees, subject to all the duties and liabilities of a guardian duly appointed"); *In re Estate of Rosini,* 426 Pa. 220, 232 A.2d 191, 192 (1967) (holding that a guardian acting under an invalid decree of incompetency was to be treated as a de facto guardian). Regardless of the authority at that point, Mr. Keith apparently adopted the prior agreement by memorializing it after he was legally appointed guardian of Sharon Eagan. As discussed *infra,* the propriety of

this approach is left to the discretion of our sister court in New Jersey.

4. The rule is reprinted in pertinent part in note 19 *infra.*

5. A referral fee of this type is specifically allowed by New Jersey Court Rule 1:39–6(d), which allowed a certified trial attorney to divide a fee for legal services with a referring lawyer regardless of the referring lawyer's level of participation in the prosecution of the case referred. It is uncontested that Mr. Bross is a certified civil trial attorney. *See* Bross Response exhibit 2, ¶ 4 (Affidavit of Sheldon Bross).

with notice to Mr. Bottitta, upon an increase or decrease of the estate's assets. *See* Bross Response exhibit 5 (Judgment for Appointment of Guardian entered by the New Jersey Superior Court). Neither Mr. Keith nor Mr. Bross, who represented Mr. Keith at the hearing, disclosed to the New Jersey court or to Mr. Bottitta the pre-existing referral fee arrangement. Both Messrs. Bross and Keith have explained that at the time, they thought there was no need to make a disclosure of their referral fee arrangements because they assumed that the New Jersey court would review any fees at the conclusion of the litigation before the disbursal of any funds, and that the arrangement could be disclosed at that time. *See* Second Bross Aff. ¶ 8; Third Keith Aff. ¶ 8; *see also id.* ¶ 7 ("The guardian ad litem, then appointed by the New Jersey Superior Court, never raised any issues regarding my compensation."). On November 25, 1991, Mr. Keith signed a written contingent fee agreement memorializing the initial oral agreement retaining Bross, Strickland to represent Sharon Eagan in the current personal injury action. *See* Bross Response exhibit 3.

6. Mr. Keith initially averred that he spent 110 hours working on behalf of the estate. *See* Third Keith Aff. ¶ 11. At the February 15, 1994, hearing, however, Mr. Keith stated that he had probably spent 200 hours on the case. *See* Tr. of Hrg. on 2/15/94, at 35. Since it is unclear whether the 200 hour figure referred to Mr. Keith's services as a guardian as well as his services as a lawyer, the Court will accept the averred 110 hour figure as the correct estimate of the time expended on this case by Mr. Keith as a lawyer. Even this figure, however, is suspect, given Mr. Keith's description of his services related to this lawsuit, many of which strike the Court as being more appropriately characterized as acting as a client rather than as a lawyer. *See* Third Keith Aff. ¶ 12 ("I gathered information and [medical] reports on my sister from numerous sources ... and furnished them to Mr. Bross's office. I arranged for and attended medical examinations of Sharon required by Defendants ... I attended depositions in Philadelphia and had a meeting with Mr. Bross prior thereto.... I attended the settlement hearing before this Court on October 28, 1993 and a meeting with Mr. Bross the day before in Newark, New Jersey.").

Regardless of the actual figure, to the extent that Mr. Keith performed legal work, this arrangement did not benefit the estate since it had already contracted Bross, Strickland to do the legal work for a set contingent fee. Therefore, to the extent that Mr. Keith performed any legal

■ The instant case was filed in this Court in January of 1992. Over the ensuing twenty months, Mr. Bross dutifully pursued the litigation, eventually spending approximately 300 hours on the litigation. Mr. Keith also performed legal tasks on behalf of the estate.[6] After some discovery was taken, a settlement in the amount of $1.2 million was reached between Mr. Keith and C.A.R.E. in the summer of 1993. Mr. Bross has now submitted to the Court as an uncontested matter the instant motion, seeking approval of the settlement agreement and the planned disbursement of the $1.2 million lump sum.[7]

As outlined in the certification of Robert R. Cary, Esq., a member of Bross, Strickland, the agreement reached by the parties specified the following disbursements:

| | |
|---|---|
| $ 600,000 | Purchase of an annuity ($3,333.72 per mo. for 30 years certain and life) |
| $ 16,482 | Litigation Disbursements |
| $ 253,403.60 | Attorney's fees [8] |
| $ 330,114.40 | Medical Bills, remainder to the estate |

TOTAL $1,200,000.00

work in this case, it inured to the benefit of Bross, Strickland by relieving them of the duty to perform work they had contracted to do.

7. After speaking by telephone with the judge presiding over the estate, and upon the judge's advice, *see* Second Bross Aff. ¶ 15 ("Judge Margolis indicated that the approval of the settlement of the litigation and of my fee should be submitted to Judge Robreno...."), Mr. Bross made the submission by letter, dated August 9, 1993, sent by counsel for the defendant on plaintiff's behalf. By letter of August 18, 1993, the Court returned the proposed settlement to defense counsel, noting that a request for approval must be made by motion. *See* Letter from R. Michael Mori to the Court of 9/17/93, at 3–4 (copy of the Court's letter of Aug. 18, 1993). The submission by letter is discussed further *infra*.

8. Mr. Cary's certification listed the requested attorney's fees as $253,403.60, as did subsequent representations, *see, e.g.*, Letter Br. of 11/18/93, at 5 ("The counsel fees totalled $253,403.60."). The form of order accompanying the motion for approval, however, listed the amount sought as $253,703.60. Since the use of the lower figure results in an additional $300 to the estate, the Court will assume that the lower figure was the correct one, and will add the $300 to the amount requested for medical bills.

*See* Certification of Robert Cary ¶ 8. The application for approval also contained as exhibits the annuity contract, the release and settlement agreement, an itemization of Mr. Bross's work, a copy of a medical bill, and a copy of the contingency fee agreement between Mr. Keith and Bross, Strickland. Also submitted was an affidavit sworn by Mr. Keith (the "First Keith Aff."), which averred that "there is a significant possibility of a recovery less than the amount of settlement," First Keith Aff. ¶ 7, and that in his opinion it was "in the best interest of Sharon Eagan to settle this matter for the sum of $1.2 MILLION DOLLARS," *id.* ¶ 8.

A hearing on the merits of the proposed settlement was held on October 28, 1993. In attendance were Messrs. Bross and Keith, as well as Mr. R. Michael Mori, Esq., from Mr. Bross's office. Defendant C.A.R.E. received notice of the hearing but chose not to be present.[9] At the hearing, the Court discussed with counsel the apparent discrepancy between the fee requested and the fee calculations produced by using the percentages contained in the fee agreement. *See* Tr. of Hrg. on 10/28/93, at 7–16. Mr. Mori described the method used by Bross, Strickland in reaching the figure of $253,403.60, and represented that the fee petition was in essence a request for a fee on that portion of the net settlement exceeding $1 million, *see id.* at 14, a request that the Court must rule on under the New Jersey rules governing the contingent fee agreement entered into between Mr. Keith and Bross, Strickland, *see* N.J.Ct.R. 1:21–7(f). Counsel proposed to supplement the record with a memorandum on the proper method of calculating the fees under the contingent fee agreement and New Jersey law, as well as information on any outstanding medical bills and on the financial stability of The Prudential Insurance Company of America, the proposed annuity provider.[10] *See id.* at 6, 29–30.

The Court also questioned Mr. Keith under oath concerning his sister's condition and her prognosis, the status of the New Jersey court's order appointing him guardian, and the situation regarding the unpaid medical bills. *See id.* at 20–27. During the discussion, the Court, believing Mr. Keith's role in the litigation to be no more than that of Ms. Eagan's disinterested guardian, sought his opinion as to the terms of the proposed settlement agreement:

> THE COURT: Mr. Keith, do you want to say anything about any of the items which have been requested here and do you have any views or do you think they are fair and reasonable?
>
> Mr. KEITH: Yes. I think they're fair and reasonable.

*Id.* at 25. At no point during the hearing was the financial interest Mr. Keith held in Bross, Strickland's fee disclosed to the Court.

Bross, Strickland filed a letter brief on November 19, 1993, addressing the issues raised during the hearing. As a follow up to the hearing and the letter brief, the Court sent Mr. Bross, with a copy to defense counsel, a letter on December 1, 1993:

> Dear Mr. Bross:
>
> The Court requires one final item before it can issue its ruling on the proposed settlement in the above matter. Please file a certification with the Clerk describing what, if any, referral fees are to be paid from the attorney's fees that your law firm will receive as part of the settlement.
>
> Very truly yours,
> /s/ Eduardo C. Robreno

This prompted both Mr. Bross and Mr. Keith to file affidavits (respectively, the "First Bross Aff." and the "Second Keith Aff."), discussing for the first time the interest Mr. Keith held in Bross, Strickland's fee in this case. Mr. Bross averred that the case had been referred to him by Mr. Keith on Janu-

---

9. Because, as discussed in footnote one, *supra*, defendant takes no position on these issues other than to urge the Court to approve the settlement agreement, they have not made any submissions or arguments to the Court.

10. The information on The Prudential was requested to conform with New Jersey law on structured settlements in cases involving an incompetent, which requires that there be a factual finding as to the fiscal stability of a structured-settlement provider. *See* N.J.Ct.R. 4:44–3; *Ramos by Ramos v. Ramos*, 227 N.J.Super. 336, 547 A.2d 342, 343 (Law Div.1988).

ary 2, 1991, and that he had agreed to pay him a one-third referral fee, as is his prerogative under New Jersey law. *See* First Bross Aff. ¶¶ 3–4. He also averred that Mr. Keith had "agreed to serve as [Ms. Eagan's] guardian in this case without compensation in light of the referral fee he would eventually receive," *id.* ¶ 6, that Mr. Keith had been actively involved in the case and had not asked for reimbursement for travel expenses or for his expended time, *see id.* ¶ 7, and that he and Mr. Keith had concluded that their agreement would ultimately benefit Ms. Eagan, reasoning that "[h]ad Mr. Keith requested a fee and costs as the guardian, those monies would have to be paid from Sharon Eagan's settlement monies and would constitute an amount over and above the counsel fees," *id.* ¶ 8.

Mr. Keith averred, *inter alia,* that he was the lawfully appointed guardian of Sharon Eagan, *see* Second Keith Aff. ¶ 3, that he had decided that a settlement in the amount of $1.2 million was in Ms. Eagan's best interests, *see id.* ¶ 6, and that he was "very satisfied with Mr. Bross's representation ... and the results obtained," *id.* ¶ 8. He requested that the Court approve the settlement as well as the attorney's fees. *See id.* ¶ 9.

In response to the revelation of Mr. Keith's theretofore undisclosed interest in Bross, Strickland's fee, and concerned that the previous representations made to the Court might have been tainted by the now disclosed financial arrangements of Bross, Strickland and Messrs. Bross and Keith *inter se,* the Court issued a Rule on Mr. Bross, Mr. Keith, and Bross, Strickland, to show cause why: 1) the fees claimed by Bross, Strickland, should not be reduced to the quantum meruit values of the services rendered; 2) Mr. Keith should not be denied any recovery from his fee agreement with Mr. Bross; and 3) this matter should not be referred to the New Jersey Superior Court presiding over Sharon Eagan's estate and the New Jersey Supreme Court Office of Attorney Ethics. The Rule raised the issue of the validity of the referral fee arrangement between Mr.

Keith and Bross, Strickland and the propriety of Mr. Keith's representation of the estate in this litigation, as well as the issue of whether Mr. Bross and/or Mr. Keith had violated the duty of candor to this Court. *See* Pa.R.Prof.Conduct 3.3 (Candor Toward the Tribunal) [hereinafter Pa.R.P.C.].

Mr. Bross and Bross, Strickland filed a response to the Court's Rule to Show Cause, opposing the referral of the matter to the Office of Attorney Ethics and any reduction in the firm's fee or in Mr. Keith's referral fee. No objection was made to referring the matter to the court presiding over Ms. Eagan's estate. A hearing on the Rule was held on February 15, 1994, with Mr. Bross and Bross, Strickland represented by counsel, and with Mr. Keith representing himself.

The issues the Court must decide are whether the proposed settlement is fair and reasonable, what attorney's fee is appropriate in this case, whether Mr. Keith and Bross, Strickland, respectively, are entitled to any portion thereof, and whether the conduct of Messrs. Bross and Keith, respectively, requires that the matter be referred to the appropriate disciplinary bodies and to the New Jersey Superior Court presiding over the estate and/or otherwise requires disciplinary sanction by this Court. The case is properly before the Court pursuant to its diversity jurisdiction. *See* 28 U.S.C. § 1332(a).

## II. DISCUSSION

### A. *The Court's jurisdiction to approve the settlement agreement*

#### 1. *The Source of the Court's Authority*

■ As a threshold matter, the Court must determine whether it has the authority to grant plaintiff [11] the requested relief, approval of the settlement. Normally, parties to a civil dispute can reach a money settlement among themselves, bringing a case to an end without a court's approval or intervention. *See* Fed.R.Civ.P. 41(a)(1); *see, e.g., In re Masters Mates & Pilots Pension Plan & IRAP Litig.,* 957 F.2d 1020, 1025 (2d Cir.

---

**11.** For the remainder of the opinion, references to the "plaintiff" will be to Mr. Keith unless otherwise stated.

1992); *Gardiner v. A.H. Robins Co.*, 747 F.2d 1180, 1188–89 (8th Cir.1984). In making his motion, plaintiff relied on the provisions of Federal Rule of Civil Procedure 17(c), which requires, *inter alia,* that this Court appoint a guardian ad litem or "make such other order as it deems proper for the protection of the infant or incompetent person."[12] Fed.R.Civ.P. 17(c); *see Gardner by Gardner v. Parson,* 874 F.2d 131, 138 (3d Cir.1989) (holding that the Rule empowers a court to appoint a guardian ad litem where the interests of the incompetent and the general representative conflict). Plaintiff reads the language of 17(c) as granting this Court broad license to issue an order intended to protect Ms. Eagan's interests, including an order approving the proposed settlement. *See* Pl.'s Mem. of Law in Support of Mot. to Approve Settlement at 10–11 [hereinafter Pl.'s Mem. in Support].

Though the Court at first accepted this broad reading of 17(c), upon reflection it appears that this interpretation is incorrect, the thrust of Rule 17 being the acquisition of a proper representative for an incompetent.[13] *See* 6A Charles A. Wright et al., *Federal Practice and Procedure: Civil 2d* § 1571, at 511 (2d ed. 1990) [hereinafter *Federal Practice and Procedure*] (noting that the objectives of the Rule are "to afford an infant or incompetent person a representative in federal court and to provide the district judge with authority to make certain that disabled persons are adequately protected"); *see also* 3A James W. Moore & Jo D. Lucas, *Moore's Federal Practice* ¶ 17.26 at 17–219 (1993) ("Rule 17(c) deals only with the protection of incompetents in their status as parties, and gives no general powers over their persons or property."). Instead, the more certain sources for the Court's authority to approve the settlement of the case is the state law

that this Court must apply, as well as the Court's inherent duty to protect the interests of minors and incompetents that come before it.

■ As stated by the Ninth Circuit, in discussing the scope of a guardian ad litem's authority to compromise a minor's claim:

It is an ancient precept of Anglo–American jurisprudence that infant and other incompetent parties are wards of any court called upon to measure and weigh their interests. The guardian ad litem is but an officer of the court. While the infant sues or is defended by a guardian ad litem or next friend, every step in the proceeding occurs under the aegis of the court.

As an officer of the court, the guardian ad litem traditionally lacks any personal authority whatsoever to prejudice the substantial rights of the minor litigant.... Indeed, from the time of the early courts of chancery a guardian ad litem has been unable to bind a minor litigant to a settlement agreement absent an independent investigation by the court and a concurring decision that the compromise fairly promotes the interests of the minor, who, as we repeat, is a ward of the court.

*Dacanay v. Mendoza,* 573 F.2d 1075, 1079 (9th Cir.1978) (citations omitted) (emphasis added); *accord Garrick v. Weaver,* 888 F.2d 687, 693 (10th Cir.1989) (noting that a court has "a general duty ... to protect the interests of infants and incompetents in cases before the court"); *Dean v. Holiday Inns, Inc.,* 860 F.2d 670, 673 (6th Cir.1988); *see also Bunting v. Bunting,* 87 N.J.Eq. 20, 99 A. 840, 841 (Ch.1917) ("It is the duty of the court to protect the interest of an infant party to litigation, and to exercise a general supervision over the conduct of the next friend or guardian ad litem."); *Turner v. Andrews,* 143 Fla. 88, 196 So. 449, 450 (Fla.

---

**12.** The full text of Rule 17(c) reads as follows:

(c) Infants or Incompetent Persons. Whenever an infant or incompetent person has a representative, such as a general guardian, committee, conservator, or other like fiduciary, the representative may sue or defend on behalf of the infant or incompetent person. An infant or incompetent person who does not have a duly appointed representative may sue by next friend or by a guardian ad litem. The court shall appoint a guardian ad litem for an infant

or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person.

**13.** "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters Nat'l Bank & Trust Co.,* 335 U.S. 595, 600, 69 S.Ct. 290, 293, 93 L.Ed. 259 (1949) (Frankfurter, J., dissenting).

1940) ("Courts are charged under the law with the duty and obligation of caring for infants and incompetents upon the theory that they are wards of the court."). Called on to adjudicate a claim brought on behalf of an incompetent, this Court must treat the incompetent as its ward, and must ensure that she is treated fairly and justly.

Judicial approval of the compromise of an incompetent's claim is also compelled by statute in New Jersey, the state in which Ms. Eagan's estate is administered, *see* N.J.Ct.R. 4:44–3; *Ramos,* 547 A.2d at 343, and Pennsylvania, the state in which the Court is situated, *see* Pa.R.Civ.P. 2064. Though both of these are "procedural" rules, they are binding on this Court, since they affect the substantive rights of the litigants— by their operation, the authority to compromise an incompetent's claim is vested in the court, rather than in the incompetent's guardian.[14] Therefore, the Court must apply these rules under the precepts established in *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), requiring the application of substantive state law in diversity actions. *See also Sosenke v. Norwood,* Civ.A. No. 91–2623, 1993 WL 512824 (E.D.Pa. Dec. 6, 1993) (applying Pennsylvania Rule of Civil Procedure 2039, compromise of a minor's claims, in reviewing a proposed settlement of a diversity action).

## 2. *The Standard for Approval*

A related question is what standard the Court must apply in reviewing the proposed settlement. A federal court sitting in a diversity case is required to apply the same substantive law as would be applied by a state court of its forum, i.e., the Commonwealth of Pennsylvania, *see Erie,* 304 U.S. at 78, 58 S.Ct. at 822, including the choice of law rules, *see Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Blumenfeld Dev. Corp. v. Carnival Cruise Lines, Inc.,* 669 F.Supp. 1297, 1321 (E.D.Pa.1987). Under Pennsylvania law, in choosing the appropriate law, the Court must apply a "flexible rule which permits analysis of the policies and interests underlying the particular issue before the court." *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796, 805 (1964); *see also Carrick v. Zurich–American Ins. Group,* 14 F.3d 907, 909 (3d Cir.1994) (citing *Griffith* as the controlling precedent). As described by the Third Circuit Court of Appeals, the choice of law analysis entails "a hybrid approach that 'combines the approaches of both Restatement II (contacts establishing significant relationships) and "interest analysis" (qualitative appraisal of the relevant States' policies with respect to

---

**14.** As outlined in *Hanna v. Plumer,* a procedural rule is deemed substantive, and thus binding on this Court, when

> application of the rule would make so important a difference to the character or result of the litigation that failure to enforce it would unfairly discriminate against citizens of the forum State, or whether application of the rule would have so important an effect upon the fortunes of one or both of the litigants that failure to enforce it would be likely to cause a plaintiff to choose the federal court.

*Hanna,* 380 U.S. 460, 468 n. 9, 85 S.Ct. 1136, 1142, 14 L.Ed.2d 8 (1965). The Third Circuit has identified this as the proper inquiry to be made in determining whether a state procedural rule is to be applied by a federal court sitting in diversity. *See Simmons v. City of Philadelphia,* 947 F.2d 1042, 1085 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992); *Fauber v. KEM Transp. & Equip. Co.,* 876 F.2d 327, 331 (3d Cir.1989).

Not applying the rules requiring Court oversight of the compromise of an incompetent's claim would trigger both prongs of the *Hanna* principle. An unscrupulous guardian would be prompted to bring an incompetent's claim in federal court, thereby evading the state court's judicial oversight of any settlement and depriving the incompetent of that protection.

Plaintiff argues that the state rules do not apply in the instant case because "court approval is a safeguard procedure for matters involving an incompetent person, rather than outcome determinative." *See* Pl.'s Mem. in Support at 10. He further states that no forum shopping was engaged in here, since the forum was chosen for jurisdictional reasons and approval law is similar in both Pennsylvania and New Jersey. *See id.* Though it may be true that approval of settlements is not outcome determinative, different provisions regarding such authority can result in forum shopping. Comparing the law of states mischaracterizes the problem, since the forum shopping that *Hanna* seeks to prevent is that between *state* and *federal* courts, not between those of two states. As already stated, a corrupt guardian could seek solace in the lack of explicit authority in the Federal Rules of Civil Procedure for court approval of settlements were this Court not to apply the state procedural rules allowing such review.

the controversy).'" *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 (3d Cir.1991) (quoting *Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1311 (3d Cir.1978)). The present issue, approval of the settlement, presents a choice between the law of Pennsylvania, where the suit was filed and where Barbara Jackson allegedly resides, and the law of New Jersey, where the incompetent is domiciled,[15] where the estate is being administered, and where the contingent fee and referral agreements were entered into.[16]

Before engaging in this analysis, however, the Court must consider whether the case presents a so-called "false conflict" between the law of the two states. "A false conflict exists if only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law. In such a situation, the court must apply the law of the state whose interests would be harmed if its laws were not applied." *Id.* (citing *Cipolla v. Shaposka*, 439 Pa. 563, 267 A.2d 854, 855 (1970) and *Kuchinic v. McCrory*, 422 Pa. 620, 222 A.2d 897, 899–900 (1966)); *see also Zygmuntowicz v. Hospitality Invs., Inc.*, 828 F.Supp. 346, 349–50 (E.D.Pa.1993) (applying the *Lacey* false conflict analysis). A review of the applicable New Jersey and Pennsylvania law demonstrates that the instant situation presents such a false conflict, requiring that the Court apply New Jersey law.

Both New Jersey and Pennsylvania require that a court review any proposed settlement of an incompetent's claim to confirm that the settlement is fair and reasonable. *See* N.J.Ct.R. 4:44–3; Pa.R.Civ.P. 2064;[17] *cf. Bauer by Bauer v. Griffin*, 108 N.J.Super. 414, 261 A.2d 667, 669 (App.Div.) *(per curiam )* (denying infant plaintiff's motion to vacate judgment where the lower court had approved a settlement), *certif. denied*, 56 N.J. 245, 265 A.2d 701 (1970). Both rules seek to protect the interests of an incompetent plaintiff by guaranteeing that a court will review the actions taken by the incompetent's representative. The essential difference between the two is that New Jersey requires that a reviewing court make factual findings concerning the fiscal stability of any provider of a structured settlement. *See* N.J.Ct.R. 4:44–3. Although requiring the Court to make findings concerning the fiscal stability of a structured-settlement provider would not impinge on Pennsylvania's interests as expressed in Rule 2064, not applying the standard would, on the other hand, fail to promote New Jersey's interest in ensuring that there is a reasonable probability that

---

**15.** Though Ms. Eagan currently resides in Colorado, Mr. Keith represented that she is still a domiciliary of New Jersey. *See* Pl.'s Mem. in Support at 8.

**16.** Guatemalan law would have been a possible choice regarding the tort claim in this case. As to the approval of the settlement, however, it is clear that there are no appreciable Guatemalan interests involved.

**17.** The New Jersey rule reads in pertinent part as follows:

All proceedings to enter a judgment to consummate a settlement in matters involving infants and incompetents shall be heard by the court without a jury. The court shall determine whether the settlement is fair and reasonable as to its amount and terms. In the case of a structured settlement providing for deferral of all or part of the proceeds thereof, the court shall also satisfy itself, based on the financial security of the obligor or surety and such other relevant facts as may be adduced, of the reasonable certainty that all future payments will be made as proposed by the settlement....

The court, on the request of the claimant or the claimant's attorney or on its own motion, may approve the expenses incident to the litigation, including attorney's fees....

N.J.Ct.R. 4:44–3. The Pennsylvania rule reads in pertinent part as follows:

(a) No action to which an incompetent is a party shall be compromised, settled, or discontinued except after approval by the court pursuant to a petition presented by any party in interest.

(b) When a compromise or settlement has been approved by the court ..., the court, upon petition by the guardian or the guardian ad litem or any party to the action, shall make an order approving or disapproving any agreement entered into by the guardian or the guardian ad litem for the payment of counsel fees and other expenses out of the fund created by the compromise, settlement or judgment; or the court may make such order as it deems proper fixing counsel fees and other proper expenses. The balance of the fund shall be paid to the guardian of the estate of the incompetent qualified to receive the fund, if he has one or one is to be appointed....

Pa.R.Civ.P. 2064.

structured settlements will actually be paid in the future. Thus, the two rules present a false conflict that the Court will resolve by applying New Jersey's rule. Doing so will not prejudice Pennsylvania's interest in protecting incompetent plaintiffs, while failure to do so would prejudice New Jersey's interest in ensuring the reliability of structured settlements. *See Lacey*, 932 F.2d at 187.

The other issue that must be resolved is the law the Court must apply in examining the request for fees made by plaintiff's counsel. Both New Jersey and Pennsylvania permit the Court to review the fees requested by counsel who has reached a settlement of an incompetent's claim, *see* N.J.Ct.R. 4:44–3 (allowing reviewing court to examine counsel's fees where, as here, a request is made for court approval of requested fees); Pa.R.Civ.P. 2064(b) (same), and the importance of such scrutiny cannot be understated. Resolution of this issue will also necessarily involve interpretation of the contingent fee agreement entered into between Mr. Keith, on behalf of the estate, and Bross, Strickland. While contingent fee agreements in Pennsylvania are subject to the general requirements of the rules of professional conduct, *see* Pa.R.P.C. 1.8(j)(2) (allowing a lawyer in a civil case to enter into an agreement for a "reasonable contingent fee"); *id.* R. 1.5 (stating general rules on fee agreements), New Jersey has a comprehensive set of rules addressing the issue of contingent fee agree-

ments.[18] Court Rule 1:21–7 establishes fairly strict requirements for contingent fee agreements, including a sliding cap on fees, a limit on fees to the first $1 million recovered (barring application to the court), and a 25% cap on fees earned in actions settled on the behalf of infants and incompetents. *See* N.J.Ct.R. 1:21–7(c), (f).[19] The structure evinces a strong interest on the part of New Jersey in regulating the fees that are charged by the attorneys practicing law within its confines, and in regulating the contracts by which they set those fees. *See Bernick v. Frost*, 210 N.J.Super. 397, 510 A.2d 56, 60–61 (App.Div.), *certif. denied*, 105 N.J. 511, 523 A.2d 158 (1986). As recently addressed by the District Court of New Jersey, in determining whether to interpret a contingency fee agreement under Pennsylvania law or New Jersey law,

> New Jersey has a strong interest in regulating the economic relationship between New Jersey attorneys and their clients in tort cases.... Although Pennsylvania has an interest equal to New Jersey's in protecting its citizens from the overreaching of attorneys in contingent fee cases, Pennsylvania's interest does not apply where the client involved is a New Jersey citizen injured in New Jersey who negotiated his contingent fee contract in New Jersey with a New Jersey-licensed attorney.

*Newcomb v. Daniels, Saltz, Mongeluzzi & Barrett, Ltd.*, 847 F.Supp. 1244, 1249 (D.N.J.

---

**18.** Rules regulating attorneys' fees are considered substantive. *See Elder v. Metropolitan Freight Carriers, Inc.*, 543 F.2d 513, 521 n. 5 (3d Cir.1976) (Hunter, J., dissenting) (citing 1A *Moore's Federal Practice* ¶ 0.310 n. 25t (Supp. 1975)).

**19.** *The pertinent portion of the rule reads as follows:*

> (c) In any matter where a client's claim for damages is based upon the alleged tortious conduct of another, including products liability claims, and the client is not a subrogee, an attorney shall not contract for, charge, or collect a contingent fee in excess of the following limits:
>
> (1) 33⅓% on the first $250,000 recovered;
> (2) 25% on the next $250,000 recovered;
> (3) 20% on the next $500,000 recovered; and
> (4) on all amounts recovered in excess of the above by application for reasonable fee in ac-

cordance with the provisions of paragraph (f) hereof; and

> (5) where the amount recovered is for the benefit of a client who was an infant or incompetent when the contingent fee arrangement was made, the foregoing limits shall apply, except that the fee on any amount recovered by settlement without trial shall not exceed 25%.
>
> (d) The permissible fee provided for in paragraph (c) shall be computed on the net sum recovered after deducting disbursements in connection with the institution and prosecution of the claim, whether advanced by the attorney or by the client....
>
> ....
>
> (f) If at the conclusion of a matter an attorney considers the fee permitted by paragraph (c) to be inadequate, an application on written notice to the client may be made to the Assignment Judge for the hearing and determining of a reasonable fee in light of all the circumstances....

N.J.Ct.R. 1:21–7.

1994); *see also Elder v. Metropolitan Freight Carriers, Inc.*, 543 F.2d 513, 519 (3d Cir. 1976) ("In the exercise of its paramount concern with its courts, New Jersey is free to provide that no party may be required to pay an excessive contingent fee to utilize its legal processes."). In the instant case, no Pennsylvania interest would be harmed by applying New Jersey law in interpreting a fee agreement entered into in New Jersey between a New Jersey client, injured in Guatemala, and a New Jersey-licensed lawyer. In contrast, the strong interest New Jersey has in regulating the attorney-client relationship, as expressed in Court Rule 1:21–7, would be stymied if Pennsylvania law is applied. The Court will therefore interpret the contingent fee agreement under New Jersey law.[20]

B. *The Court Will Approve the Settlement Agreement*

■ It is beyond peradventure that a guardian may not place himself or herself in a position where his or her interests conflict with those of the ward. As the New Jersey Supreme Court held in analyzing the similar fiduciary relationship that exists between a trustee and a beneficiary, "the most fundamental duty owed by the trustee to the beneficiaries of the trust is the duty of loyalty and he is not permitted to place himself in a position where it would be for his own benefit to violate that duty." *In re Koretzky's Estate*, 8 N.J. 506, 86 A.2d 238, 249 (1951); *see also* IIA Austin W. Scott & William F. Fratcher, *The Law of Trusts* § 170 (4th ed. 1987). The duty of loyalty operates as a prophylactic, irrespective of good or bad faith on the part of the guardian. *See* N.J.Stat. Ann. 3B:14–36 (West 1983) (rendering any undisclosed transaction affected by a substantial conflict of interest voidable); *Magruder v. Drury*, 235 U.S. 106, 119, 35 S.Ct. 77, 82, 59 L.Ed. 151 (1914) ("The intention is to provide against any possible selfish interest exercising an influence which can interfere with the faithful discharge of the duty which is owing in a fiduciary capacity."); *Fulton Nat'l Bank v. Tate*, 363 F.2d 562, 572 (5th Cir.1966) ("It is unnecessary to show that the

fiduciary succumbed to this temptation, that he acted in bad faith, that he gained an advantage, fair or unfair, that the beneficiary was harmed.... [T]he fiduciary is punished for allowing himself to be placed in a position of conflicting interests in order to discourage such conduct in the future."); *In re Kline*, 142 N.J.Eq. 20, 59 A.2d 14, 14 (1948) (*per curiam*). Faithful adherence to the duty is required to keep a trustee from ever being in a position where his loyalties might be divided:

"Reasons behind the establishment of the loyalty rule by equity are that it is generally, if not always, humanly impossible for the same person to act fairly in two capacities and on behalf of two interests in the same transaction. Consciously or unconsciously he will favor one side as against the other, where there is or may be a conflict of interest. If one of the interests involved is that of the trustee personally, selfishness is apt to lead him to give himself an advantage. If permitted to represent antagonistic interests the trustee is placed under temptation and is apt in many cases to yield to the natural prompting to give himself the benefit of all doubts."

*Gilliam v. Edwards*, 492 F.Supp. 1255, 1263 (D.N.J.1980) (interpreting duty of loyalty in an ERISA case) (quoting G. Bogert, *Trusts and Trustees* § 543, at 475–76 (2d ed. 1960)).

■ It is also clear that a guardian may not profit from the fiduciary relationship existing between him and his ward. *See In re Koretzky's Estate*, 86 A.2d at 249; *Silverstein v. Last*, 156 N.J.Super. 145, 383 A.2d 718, 723 (App.Div.1978). The only recompense a guardian receives as a matter of course is a commission upon an accounting to the court, though compensation for other services, including legal, may be requested from the court. *See* N.J.Stat.Ann. §§ 3B:18–1 to –33 (West 1983 & Supp.1993) (providing for fiduciaries' compensation); *In re Flynn's Es-*

---

20. To the extent that principles of fiduciary law are applicable and necessary to the Court's anal-

ysis, the law of New Jersey, where the estate is being administered, will be applied.

*tate*, 132 N.J.Eq. 85, 26 A.2d 794, 795 (Prerog.Ct.1942).[21]

In the instant case, the Court concludes that Mr. Keith breached his fiduciary duty of loyalty by placing himself in a compromised position.[22] As the guardian of Ms. Eagan's estate, his interest was in maximizing the funds recoverable by the estate as a result of this litigation, net of all costs including attorneys' fees. As a lawyer receiving a referral fee from Bross, Strickland, Mr. Keith's position was compromised, since his interest was in maximizing the firm's overall fee, of which he would receive one-third. Clearly, Mr. Keith's duty to superintend the litigation, including his willingness to terminate Bross, Strickland's representation if it proved to be inadequate, was compromised by this arrangement.

This conflict was enhanced by operation of Court Rule 1:21–7(c). Under New Jersey law, an attorney litigating a tort claim cannot receive a contingent fee on the portion of a recovery that exceeds $1 million without making application to the court. *See id.* 1:21–7(c)(4), (f). As a result, viewed from the attorney's financial perspective, once the $1 million threshold has been reached, an attorney may not claim a larger fee unless he can show to the Court that the fee must be increased to be "reasonable ... in light of all the circumstances." N.J.Ct.R. 1:21–7(f). This perspective is at odds with that of the client, who may prefer the prospect of a larger recovery, particularly one unburdened by any contingent fee, even if trial, with its accompanying risks, may be required.

Mr. Keith breached his duty of loyalty to the estate of the incompetent in yet a third manner by endorsing Bross, Strickland's petition for an *enhanced* fee. Again, the enhancement meant a higher fee for Bross, Strickland and, in turn, for Mr. Keith, and a reduced recovery for the estate. As noted above, Mr. Keith's financial interest in Mr. Bross's fee remained undisclosed until Mr. Bross and Mr. Keith responded to the Court's letter of December 1, 1993. Thus his unqualified endorsement of the Bross, Strickland application for an enhanced fee was made in this Court at a time that his interest in the Bross, Strickland fee remained undisclosed. The Court was depending upon Mr. Keith to render an honest, impartial, and uncompromised opinion as to the reasonableness of the proposed settlement. Given the burden of the undisclosed conflict under which he was operating, Mr. Keith was not at liberty to do so.

Bross, Strickland strenuously asserts that there is no conflict between the interests of a lawyer working on a contingency basis and of his client. Based on this, they argue that Mr. Keith's interest in maximizing the estate was the same whether he was acting as the guardian or as the lawyer. *See, e.g., Romano by Romano v. Lubin,* 365 Pa.Super. 627, 530 A.2d 487, 488–89 (1987), *appeal granted and discontinued,* 518 Pa. 620, 541 A.2d 747 (1988). *But see Dean,* 860 F.2d at 673 ("The interest of an attorney seeking to be awarded a fee from the settlement proceeds effectuated for a minor must always, by the nature of the relationship and the dependency of the minor, be in tension."). Even if this is so in the garden variety contingent fee case, the argument has no

---

**21.** Bross, Strickland argues that New Jersey law allows a guardian to recover for attorney's fees where the recovery is from a party other than the estate, citing to *Burr v. Contenti,* 102 N.J.Eq. 41, 139 A. 801 (Ch.1927). The instant situation, however, is not *Burr.* In that case, the trustee sought to foreclose on a mortgage held by the trust, and sought to bill his legal fees to the sale. *See id.,* 139 A. at 801–02. The court held that if the foreclosure sale of the mortgaged property resulted in proceeds greater than the remaining balance on the mortgage, then the trustee could recover his fee from that surplus, since doing so would not deplete the recovery to the trust, which was only entitled to the outstanding amount on the mortgage and no more. *See id.* at 802. In the instant case, the source of Mr.

Keith's fee is the estate, since Bross, Strickland's fee itself is deducted from the estate's recovery. Ms. Eagan's recovery is limited only by the amount of money Bross, Strickland and Mr. Keith take for themselves.

**22.** The following analysis is by necessity limited to Mr. Keith's representation of Ms. Eagan in the instant litigation. The Court expresses no view as to the adequacy or propriety of Mr. Keith's actions as Ms. Eagan's guardian outside of this litigation, a matter over which the New Jersey court administering the estate has jurisdiction. *See* N.J.Stat.Ann. § 3B:12–36 (West 1983); Bross Response exhibit 5 (order of the New Jersey Superior Court retaining jurisdiction over the Ms. Eagan's estate).

merit under the facts of this case. For example, in the ordinary case, a client may terminate the engagement of a lawyer and substitute counsel without suffering an economic loss.[23] In this case, however, terminating Mr. Bross would have been detrimental to Mr. Keith's personal interests, since he stood to recover a portion of Bross, Strickland's fee and presumably would not have recovered such a fee from just any lawyer brought in as substitute counsel. Furthermore, the contingency fee agreement itself is a further source of conflict. The interests of the lawyer and the client run parallel to each other under a flat percentage contingent fee agreement, with the lawyer receiving as a fee a constant proportion of the recovery awarded his client. To put simply, the more the client gets, the more the lawyer gets. In contrast, under the contingency fee agreement in this case, after a recovery crosses the million dollar level, the lawyer continues to work without having a settled expectation of a concomitant increase in fee. The only fee on that portion of the recovery in excess of $1 million to which the lawyer may aspire is one wholly discretionary upon an application to the Court, see N.J.Ct.R. 1:21–7(f), and, if granted, the enhanced fee comes directly from the pockets of the client. Therefore, when Mr. Keith endorsed Bross, Strickland's application for fees on the amount of the recovery in excess of $1 million dollars, he recommended the shifting of a portion of the estate's recovery to Bross, Strickland's fee, one-third of which would eventually went its way to his own wallet.[24]

Mr. Keith makes three other arguments in his favor: 1) that the result obtained in the litigation was favorable for the estate; 2) that by planning to be compensated from the fee that would otherwise go to Bross, Strickland, he was not seeking compensation from the estate for the work he has performed as guardian; and 3) that he could have retained himself instead of seeking out Mr. Bross and thereby could have received *all* of the attorney's fee. It is, of course, of no moment that a fair result under the circumstances appears to have been obtained or that Ms. Eagan's estate will allegedly benefit by Mr. Keith taking his compensation from Mr. Bross's fee rather than from the estate. Both of these are relevant considerations in determining the quantum of harm that may have resulted to the estate, but they do not determine whether a conflict existed. The duty of loyalty is a prophylactic one, and operates regardless of the results obtained, or of the good intentions of the parties. In the case of a fiduciary, the pursuit of honorable ends does not justify the use of maleficent means.[25]

Mr. Keith claims that his retention of Bross, Strickland and Mr. Bross, who are admittedly well-skilled in personal injury litigation, in lieu of retaining himself, is evidence of his lack of self-interest. In essence, Mr. Keith claims that he could have retained himself and kept the entire fee. To the

---

23. Although the terminated lawyer would be entitled to quantum meruit recovery for any work performed, that recovery would usually come from the substitute lawyer's fee and would not impact the client's recovery. *See. e.g., Buckelew v. Grossbard,* 189 N.J.Super. 584, 461 A.2d 590, 591 (Law Div.), *aff'd per curiam,* 192 N.J.Super. 188, 469 A.2d 518 (App.Div.1983).

24. Though the recommendation by the guardian as to the appropriateness of the fee was not controlling, *see, e.g., Murphy by Murphy v. Mooresville Mills,* 132 N.J.Super. 197, 333 A.2d 273, 275 (App.Div.), *certif. denied,* 68 N.J. 156, 343 A.2d 444 (1975), it was a factor that the Court could reasonably rely upon. It is self-evident that a fee application that is uncontested by the person appointed to protect the interests of the incompetent, that is in fact endorsed by said person, will be more favorably received by the Court than one that is contested.

25. In any event, payment of a one-third referral fee to Mr. Keith would be immensely generous. One-third of the fee requested, $253,403.60, amounts to just over $84,000. Mr. Keith has represented to this Court that he has expended between 110 and 200 hours in providing legal services in connection with this case. *See* Third Keith Aff. ¶ 11; Tr. of Hrg. on 2/15/94, at 35 (statement of Mr. Keith) (suggesting that he had spent approximately 200 hours on the case, without explaining the breakdown of that time). Based on these numbers, Mr. Keith would be getting compensated at an hourly rate ranging from approximately $420 to $760. This is in contrast to the compensation paid to the guardian ad litem appointed to represent Ms. Eagan at her incompetency hearing before the New Jersey court in 1991, who was compensated at a rate of $175 per hour. *See id.* at 29.

extent that Mr. Keith had little experience in personal injury cases, *see* Tr. of Hrg. on 2/15/94, at 25, he was poorly suited to represent Ms. Eagan in this case and as a guardian was duty bound to seek competent counsel. In other words, it is of little consolation to the estate that Mr. Keith *could* have breached his duty in at least one other respect but chose not to do so.

 Having found that a conflict between the interests of the guardian and the incompetent existed during the course of Mr. Keith's watch over his sister's estate, the Court must determine whether the appointment of a guardian ad litem is necessary to protect the interests of Ms. Eagan in the current litigation. *See* Fed.R.Civ.P. 17(c); *Gardner by Gardner,* 874 F.2d at 138–40; 6A *Federal Practice and Procedure, supra,* § 1570. When a conflict of interest exists, the Court is required to make such an intervention, even if the incompetent, as in this case, already has a general representative. *See Ad Hoc Comm. of Concerned Teachers v. Greenburgh No. 11 Union Free Sch. Dist.,* 873 F.2d 25, 30–31 (2d Cir.1989); *Hoffert v. General Motors Corp.,* 656 F.2d 161, 164 (5th Cir.1981), *cert. denied sub nom. Cochrane & Bresnahan v. Smith,* 456 U.S. 961, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982). The appointing of a guardian ad litem in such a situation has been specifically sanctioned by the Third Circuit in *Gardner by Gardner,* 874 F.2d at 138–39. Where a conflict of interest becomes apparent early in the litigation, appointment of a guardian ad litem would be the customary and appropriate course. *See, e.g., Hoffert,* 656 F.2d at 162 (lower court appointed guardian ad litem two months after suit was filed). In this case, the Court is concerned that Mr. Keith's conflict of interest may have

tainted his recommendation of the settlement, as well as his superintendency of Mr. Bross's activities.

If time and money were not constraints, this Court would be disposed to appoint a guardian ad litem to assess the fairness of the proposed settlement and to examine the prosecution of the case to ensure that nothing was done to Ms. Eagan's detriment. The Court will not do so for two reasons. First, the present case has been in litigation for over two years, and, as attested to by Mr. Keith, Ms. Eagan is in need of the money from this settlement:

> [I]t's three and a half years approximately since she was injured in September of 1990. She's gotten very limited therapy because there's just no money there, other than the social security disability of $681 a month. She's been evaluated and tested and insurance she had at the time paid for that. They've been advised continually and as recently as a couple [of] months ago that she needs these therapies now. There's a—she can't wait forever because of the brain damage and the memory problems. She needs it now.

Tr. of Hrg. on 2/15/94, at 32. Second, the Court, through its stewardship of this case, has gained familiarity with the law and facts of the case sufficient to allow it to render an informed judgment as to the weaknesses and the likelihood of success of Ms. Eagan's underlying action. Though the independent views of a guardian ad litem would be valuable, the Court concludes that having followed the vicissitudes of this litigation since shortly after its inception,[26] the Court is equipped to judge so unattended the fairness of the proposed settlement.[27] Under the cir-

---

26. The case was filed in January of 1992 and was transferred to the Court's calendar in September of that same year.

27. While the information before the Court may not be perfect, the Court finds that a decision should be made at this point in time. As Judge Stapleton of our Third Circuit has written in regards to the decisionmaking process:

> Because of time and expense constraints and because experience teaches that human beings make mistakes in technique, perception, logic, communication and a myriad of other areas, no decision maker can have one hundred per-

cent confidence in the information before him or her at any given point in time. Each decision therefore necessarily reflects a judgment of the decision maker that under all the circumstances it is more desirable to make a decision based on the currently available information than to wait for more complete data or more confirmation of the existing data.

*Fisher Bros. Sales, Inc. v. United States,* No. 93–1182, slip op. at 20, 1994 WL 54992, at *10 (3d Cir. Feb. 25, 1994) (Stapleton, J., dissenting), *vacated and withdrawn,* 17 F.3d 657 (1994) (setting case for rehearing in banc).

cumstances of this case, the Court will proceed to consider the merits of the settlement agreement in its present posture and will not appoint a guardian ad litem.

The Court must evaluate the merits of the proposed settlement to determine whether they are fair and reasonable. *See* N.J.Ct.R. 4:44–3. As previously discussed, Mr. Keith proposes to settle the case in exchange for a $1.2 million payment from C.A.R.E. The requested allocation of this amount is as follows: $600,000 to structure an annuity, provided by The Prudential Insurance Company of America, producing a monthly payment of $3,333.72 for 30 years certain and life; $16,482 to reimburse Bross, Strickland for disbursements made during the course of the litigation, as documented in exhibit B attached to the proposed form of order; $253,403.60 in attorney's fees to Bross, Strickland; and $330,114.40 to reimburse John Hancock Insurance Company for medical expenses paid on behalf of Ms. Eagan and to pay any outstanding medical bills to the extent deemed proper by Mr. Keith, with the remainder accruing to the estate.

■ Borrowing from the standards used in evaluating settlement proposals in class actions, *see Girsh v. Jepson,* 521 F.2d 153, 156–57 (3d Cir.1975), the Court finds that the proposed settlement of $1.2 million dollars is fair and reasonable. Having become familiar with the litigation, the Court agrees that a recovery greater than what was agreed to by the guardian was by no means certain. There were open questions concerning what law applied and the effect of that determina-

tion on the recovery. *See* Second Bross Aff. ¶ 13 (asserting that under Guatemalan law there would be a reduced or no recovery). Assertion of personal jurisdiction over Barbara Jackson was also uncertain. As a practical matter, trial of the case might not come to pass for many more months, time that Ms. Eagan can ill afford to wait. And given her delicate state, and the need for funds to meet her mounting expenses, a settlement in hand is better than the perhaps illusory prospect of a greater recovery after trial. Therefore, the Court reiterates its conclusion that the $1.2 million dollar settlement is fair and reasonable.

The Court also finds that the proposed disposition of the $1.2 million, sans the attorney's fee, an issue taken up *infra,* is fair and reasonable. The annuity will provide her with approximately $40,000 a year in tax-free income, and the Court is satisfied, given the financial soundness of the issuer of the annuity,[28] that there is a reasonable certainty that the annuity payments will be made. *See* N.J.Ct.R. 4:44–3. The amount allocated to medical expenses is sufficient to pay outstanding claims.[29] And the expenses proffered by Bross, Strickland are reasonable for litigation of this type. The Court therefore approves the disbursement of the $1.2 million dollar settlement in the following manner: $600,000 for the annuity, $16,482 in litigation expenses, and $330,114.40 for medical bills.[30] As discussed below, however, the Court does not approve the fee request made by Mr. Bross and, derivatively, by Mr. Keith.

---

**28.** The Prudential Insurance Company of America is rated A++XV by A.M. Best and AA+ by Standard and Poors. *See* Letter Br. of 11/18/93 exhibit B (letter from Daniel Raymond).

**29.** John Hancock has made the estate an offer of $225,419.93, which is 75% of the amount paid in medical expenses by the company on behalf of Ms. Eagan, to settle their claim on the estate. An additional $106,575 is being requested by the Head Injury Center at Hillcrest, another of Ms. Eagan's medical providers. Assuming that this entire amount was sought by the Head Injury Center, it would only be entitled to 75% of it, since it would have to pay a pro-rata share of the attorney's fee, *see Hedgebeth by Meek v. Medford,* 74 N.J. 360, 378 A.2d 226, 229–30 (1977), which is capped at 25%, *see* N.J.Ct.R. 1:21–7(c)(5).

Therefore, given the outstanding medical bills, the worst-case scenario is that the estate will have to pay approximately $305,000 in medical bills. Any monies not paid out in medical expenses would revert to the estate.

**30.** In setting forth an allocation for medical expenses, the Court passes no judgment as to the propriety of paying any of the medical bills now pending. Mr. Keith, as the duly appointed guardian of Ms. Eagan's estate, is free to exercise his discretion as to what medical bills should or should not be paid, so long as his actions are consistent with the terms of this memorandum and with the requirements of the New Jersey Superior Court, which has jurisdiction over Ms. Eagan's estate.

### C. *The Request for Legal Fees*

As part of the motion for approval of the proposed settlement, plaintiff has made a request for approval of attorney's fees in the amount of $253,403.60.[31] The Court's inquiry is twofold—it must determine: 1) what the maximum appropriate fee is; and 2) how much of the maximum appropriate fee should be paid to Bross, Strickland and Mr. Keith in light of their respective missteps in this litigation. In doing so, the Court will recognize and enforce the terms of the contingent fee agreement between the estate, by Mr. Keith, and Bross, Strickland, by Mr. Bross. The Court will also recognize and enforce the referral fee agreement entered into by Bross, Strickland and Mr. Keith. After determining the amounts Bross, Strickland and Mr. Keith are entitled to receive under the contingent fee and referral fee agreements, the Court will determine, in the case of Mr. Keith, whether his breach of duty warrants the forfeiture of his fee, and in the case of Mr. Bross and Bross, Strickland, whether a sanction is appropriate, and if so, the nature of the sanction.

### 1. *Determining the Maximum Appropriate Fee*

The determination of the maximum appropriate fee must begin with an understanding of applicable New Jersey law. New Jersey exercises strict control over the contingent fees charged by its attorneys in the prosecution of tort cases. The limits established by the applicable Court Rule allow an attorney to collect 33⅓% on the first $250,000 recovered; 25% on the next $250,000 recovered; and 20% on the next $500,000 recovered.[32] *See* N.J.Ct.R. 1:21–7(c)(1)–(3). This pro-

duces a fee of $245,833.33 on a net recovery of $1 million.[33] If an attorney wishes to collect a fee on that portion of a net recovery that is in excess of $1 million because the attorney considers the fee allowed under the provisions to be unreasonable, then an application must be made to the Court,[34] which makes a determination of "a reasonable fee in light of all the circumstances." N.J.Ct.R. 1:21–7(f); *see, e.g., Iskander by Iskander v. Columbia Cement Co.,* 192 N.J.Super. 114, 469 A.2d 103 (Law Div.1983), *aff'd,* 197 N.J.Super. 169, 484 A.2d 353 (App.Div.1984); *Merendino v. FMC Corp.,* 181 N.J.Super. 503, 438 A.2d 365 (Law Div.1981).

The fee amount generated by applying the percentages set forth in the rule is modified, however, by subparagraph (c)(5), which provides for a lower fee when a matter involving an incompetent is settled:

> [W]here the amount recovered is for the benefit of a client who was an infant or incompetent when the contingent fee arrangement was made, the foregoing limits shall apply, except that the fee on any amount recovered by settlement without trial shall not exceed 25%.

N.J.Ct.R. 1:21–7(c)(5). This subparagraph acts as a cap on the fees calculated under subparagraphs one through three when, as in the instant case, the attorney represents a minor or an incompetent and the case is settled before trial.

■ Plaintiff's first attempt to obtain court approval of the proposed attorney's fee was plainly inadequate. Forwarded to the Court by *defense counsel* at the apparent request of Mr. Bross, this summary request for approval of settlement consisted of a

---

**31.** As previously discussed, *see supra* note 8, there was a discrepancy in the figures submitted by the plaintiff in regards to the requested fee, with the fee listed at times as $253,403.60 and at others as $253,703.60. The Court will use the lower of the two figures in this discussion, and where quoting from a source that indicates the higher figure, the Court will indicate the correct number by including brackets.

**32.** All computations are made on the net recovery, which is the gross sum recovered less the disbursements made in conducting the litigation. *See* N.J.Ct.R. 1:21–7(d).

**33.** (33.33% × $250,000) + (25% × $250,000) + (20% × $500,000) = $83,333.33 + $62,500 + $100,000 = $245,833.33.

**34.** In New Jersey the application is made to the Assignment Judge, who acts as the chief judicial officer of the vicinage in which she sits. *See* N.J.Ct.R. 1:33–4. Since there is no Assignment Judge as contemplated in the rule in this Court, the undersigned will rule on the current application under 1:21–7(f). *See, e.g., Donaghy v. Napoleon,* 543 F.Supp. 112, 113–15 (D.N.J.1982) (applying rule 1:21–7 and approving a request for fees in excess of the percentage limits set forth in the rule).

proposed form of order, an affidavit sworn by Mr. Keith, and two exhibits, one a letter discussing the proposed annuity, the other a list of the expenses incurred by Bross, Strickland.[35] The portion of the proposed form of order concerning attorney's fees read *in toto* as follows:

> Bross, Strickland, Cary & Grossman, P.A. shall be awarded a total fee of $253,[4]03.60 for services rendered on behalf of SHARON EAGAN, in accordance with New Jersey Court Rule 1:21–7(c).

Proposed Form of Order at 2. No application under 1:21–7(f) for an enhanced fee was made, nor was there any explanation of how Bross, Strickland had arrived at the $253,403.60 figure for attorney's fees. Without a fee application, the request for $253,403.60 in fees was clearly in error, and the statement that the fee requested was "in accordance" with the applicable rule was at best misleading and at worst an outright misrepresentation. The effect of the error was compounded by the fact that the fee application was not subject to the adversarial crucible, given that the defendants had no interest in the manner the $1.2 million it had agreed to pay was distributed.

Dissatisfied with the request for approval, and unguided as to the methodology used in arriving at the requested figure, the Court asked that a formal motion be filed, explaining, *inter alia*, the calculation of the fee request. *See* Letter from R. Michael Mori to the Court of 9/17/93, at 3–4 (copy of the Court's letter of Aug. 18, 1993). In response, the same proposed form of order and affidavit were filed. In addition, a certification was filed by Mr. Bross's partner, Mr. Cary, outlining the procedure used in reaching the figure:

> The contingent fee arrangement was calculated as follows:
> A. 25% of the first $500,000.00;
> B. 20% of the next $500,000.00;
> C. 15.5% of the next $250,000.00.

The net recovery is the total recovery ($1,200,000.00) less expenses ($16,482.00), which is $1,183,518.00. 25% of the first $500,000.00 is $125,000.00; 20% of the next $500,000 is $100,000.00; and 15.5% of the remaining $183.518 is $28,403.60. Accordingly, the counsel fees are $253,403.60.

Certification of Robert Cary ¶ 12. No mention was made in the certification, nor in the accompanying memorandum of law, of Rule 1:21–7(f) and its requirements.

At the October 1993 hearing, the Court engaged Mr. Bross and Mr. Mori in a colloquy concerning the proper application of 1:21–7(c)(5). The question presented was how the 25% cap interacted with the percentage limits contained in the fee agreement, limits which are identical to the maximum limits in 1:21–7(c)(1) through (c)(3). The method implicitly proposed by Mr. Cary in his calculations applied a 25% cap to each prong of the calculation. Thus, the fee on the first $250,000 of the recovery would be limited to 25%, rather than the otherwise permissible 33⅓%. Under this formulation, the fee on the first $1 million of the net recovery would be $225,000. This formulation was seconded by Mr. Mori at the hearing, *see* Tr. of Hrg. on 10/28/93, at 13–14, and was described by Mr. Bross as the standard method of calculating a fee in New Jersey when a party is an incompetent, *see id.* at 15.

The alternative method, the one posited by the Court at the hearing as the correct interpretation, was to apply the agreed-to percentages, i.e., 33⅓%, 25%, and 20%, to determine the fee, which is then subject to a decrease if the fee exceeds 25% of the net recovery. *See id.* at 12–14. Thus, the fee would be calculated using the percentages in the agreement, including the 33⅓% on the first $250,000, and then reduced to 25% of the net recovery if necessary. Under this method, the fee on the first $1 million of the net recovery would be $245,833.33, roughly $21,000 more than under the method suggested by counsel. *See supra* note 33. To assist the Court in interpreting the rule, counsel was asked to brief the issue in a supplemental response. *See* Tr. of Hrg. on 10/28/93, at 27. At the hearing, it was also

---

**35.** Though the submission made by letter was not filed of record, the items contained in the submission were all resubmitted in identical form when plaintiff made a formal motion for approval of the settlement. All references to the items submitted by letter will be to the identical items submitted by motion.

established that counsel's application was in fact an application under Rule 1:21–7(f), *see id.* at 10–11, and the Court indicated it would construe it as such, *see id.* at 27.

In their letter brief filed as a supplemental response after the hearing, Bross, Strickland reversed field, now agreeing that the Court's interpretation was the correct one:

> The Court expressed that the construction of *R.* 1:21–7(c)(5) allowed for a maximum [fee] of 25% of the recovery, although the limitations set forth in *R.* 1:21–7(c)(1), (2) and (3) are to be applied. After a review of New Jersey case law, the Court's interpretation of *R.* 1:21–7(c)(5) is correct.

Letter Br. of 11/18/93, at 5 (citations omitted). This apparent concession resulted in an increase of approximately $21,000 in the non-discretionary aspect of counsel's fee.[36] In support of its change of heart, Bross, Strickland relied on *McCombs v. New Jersey State Police,* 242 N.J.Super. 261, 576 A.2d 349 (Law Div.1990). This case, however, *had absolutely nothing to do with the interpretation of the rule,* and does not support Bross, Strickland's position. *McCombs* dealt with a request by counsel to receive a contingent fee greater than 25%, where the plaintiffs were infants and where the guardian ad litem opposed the request. *See id.,* 576 A.2d at 350. Rejecting the attorney's argument, the *McCombs* court held that the 25% limitation applied to wrongful death actions on behalf of infant plaintiffs, *see id.,* that settling the case after a jury was selected did not avoid the 25% limitation, *see id.* at 351, and that the difficulty of the case and the opinion of the parties as to the quality of the lawyer's services were irrelevant in determining whether the 25% limitation applied, *see id.* There is absolutely no discussion in the opinion of how the 25% limitation relates to the limitations specified in the remainder of the rule. Also significant in assessing counsel's dealings with the Court was counsel's failure to cite three reported opinions by Assignment Judge Simpson of the New Jersey Superior Court that state, albeit in *dicta,* that the proper method of calculating a fee where

Rule 1:21–7(c)(5) applies is as initially proposed by counsel, the 25% cap being applied to each portion of the settlement amount. *See Bambi v. Dr. O,* 196 N.J.Super. 349, 482 A.2d 536, 538 (Law Div.1984); *A by J v. D,* 196 N.J.Super. 340, 482 A.2d 531, 534 (Law Div.1984), *overruled on other grounds by Kingman v. Finnerty,* 198 N.J.Super. 14, 486 A.2d 342, 344 (App.Div.1985); *Merendino,* 438 N.J.2d at 367 (applying former Rule 1:21–7(c)(7), the equivalent of 1:21–7(c)(5)); *cf.* Pa.R.P.C. 3.3(a)(3) (requiring a lawyer to disclose to the court "legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel").

The Court concludes, however, that it need not decide which of the two constructions of Rule 1:21–7(c)(5) is the proper one, since the contingent fee agreement itself, which was drafted by Bross, Strickland, indicates the method to be used ·in calculating the fee, application of which does not result in an amount that exceeds the permissible limits under either construction of 1:21–7(c)(5). The agreement between Bross, Strickland and the estate incorporated the requirements of the rule as follows:

> ▮▮▮▮ The legal fees will be reduced to 25% of the net recovery if this matter is settled without trial.

Bross Response exhibit 3 at 2. During the October hearing, Mr. Bross explained that the manner of applying 1:21–7(c)(5), *the manner reflected in the retainer agreement itself,* was to reduce the 33⅓% that would otherwise be applied to the first $250,000 recovered. *See* Tr. of Hrg. on 10/28/93, at 8–9, 12–13. This in fact was the method used by Bross, Strickland in calculating the requested fee. *See* Certification of Robert Cary ¶ 12. These representations evince an intent on the part of Bross, Strickland that the 25% limitation is to be applied to each portion of the recovery. Moreover, as a matter of equity, Bross, Strickland is estopped from changing its position to the detriment of the estate, which would be the effect of not applying the 25%

---

**36.** Using the method originally adopted by the Court results in a fee application under 1:21–7(f) of only $7,570.27 ($253,403.60–$245,833.33).

Under the method originally pressed by Bross, Strickland, the application is for $28,403.60 ($253,403.60–$225,000).

limitation to each portion of the recovery. Therefore, based on Bross, Strickland's own written fee agreement, as well as its initial representations to the Court, the Court holds that the 25% limitation shall be applied to each portion of the recovery.[37] Applying the percentages provided in the fee agreement, the Court finds that the appropriate fee under the contingent fee agreement and New Jersey Court Rule 1:21–7(c) is $225,000, representing 25% of the first $250,000, 25% of the next $250,000, and 20% of the next $500,-000.

Bross, Strickland has also made application for a fee enhancement. Initially, it asked for roughly $28,000 extra, representing 15.5% of the net recovery in excess of $1 million, i.e., 15.5% of $183,518. *See* Certification of Robert Cary ¶ 12. Subsequently, under the assumption that under the contingent fee agreement it was entitled to an unenhanced fee of $245,833.33, it requested only $7,570.27. In any event, the Court concludes that, examining the facts of the litigation in light of the factors established in Rule of Professional Conduct 1.5(a),[38] Bross, Strickland is not entitled to an enhanced fee of any kind. *See* N.J.Ct.R. 1:21–7(e) (requiring that contingency fees conform with RPC 1.5(a)); *see, e.g., Iskander by Iskander v. Columbia Cement Co.,* 197 N.J.Super. 169, 484 A.2d 353, 354–55 (App.Div.1984) *(per curiam )* (affirming lower court's use of the factors listed

in RPC 1.5(a)). Bross, Strickland argues that the difficulty of the case, the efforts, skill, and ability of Mr. Bross, and the results obtained all favor the granting of an enhanced fee. The Court does not agree. As a preliminary procedural matter, "[t]he claim of inadequacy must ... be thoroughly substantial and documented and cannot rest merely on the claim of a successful result in a generally difficult type of litigation without showing of the particular difficulty of the specific litigation in question." Sylvia B. Pressler, *Current N.J. Court Rules,* Comment R. 1:21–7(f) (1993). This Bross, Strickland did not do. Though there was an apparent jurisdictional problem regarding defendant Jackson, jurisdiction over the deep-pocket defendant, C.A.R.E., was not an issue. The case was resolved without trial and without much discovery or motion practice. *Cf. Iskander,* 469 A.2d at 108 (matter was resolved after an 18–day trial). Moreover, the hours spent by Mr. Bross on this matter, approximately 300, *see* Second Bross Aff. ¶ 16, were not inordinate over the course of over one-and-a-half years of litigation. *Cf. A by J,* 482 A.2d at 534 (approving enhanced fee application where counsel had spent over 2600 hours on the litigation). And the activities listed by counsel as being indicative of the superlative effort expended on the prosecution of this case strike the Court as being

---

37. Even as a matter of contract interpretation this result would follow. The contract term in this case is, on its face, susceptible of two equally plausible interpretations—the reduction can be imposed *before* or *after* the percentages outlined in the contingent fee agreement are applied—thereby making it ambiguous. *See In re Barclay Indus., Inc.,* 736 F.2d 75, 79 (3d Cir.1984) ("To be unambiguous a contract must be capable of only one reasonable reading."). Where a term is ambiguous, the court must construe the term against the party who has prepared the contract. *See Moses v. Edward H. Ellis, Inc.,* 4 N.J. 315, 72 A.2d 856, 860 (1950). This rule applies with even greater force to an agreement between an attorney and a client, and such agreements "should be liberally construed in favor of the client." *Jersey Land & Dev. Corp. v. United States,* 342 F.Supp. 48, 54 (D.N.J.1972). Construing the term in favor of Ms. Eagan would require maximizing the recovery to the estate—the 25% limitation would be applied to each portion of the recovery.

38. New Jersey Rule of Professional Conduct 1.5(a) reads as follows:

(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent.

fairly typical of any multi-jurisdictional tort case. *See, e.g.,* Second Bross Aff. ¶ 10 (retaining Guatemalan attorney); *id.* ¶ 11 (traveling to Guatemala with two Spanish-speaking attorneys to conduct depositions); *id.* ¶ 12 (researching jurisdictional issues). As a substantive matter, the Court questions counsel's assertion that Guatemalan law might have been applicable, and that, if such had been the case, there would have been no recovery. *See id.* ¶ 13. In fact, as a matter of choice-of-law analysis, the greater the likelihood that an injured plaintiff would not recover under Guatemalan law, the lesser the likelihood that a Pennsylvania court would choose to apply Guatemalan rather than New Jersey law, it appearing that the interests of New Jersey in compensating an injured domiciliary outweigh the interests of Guatemala in a lawsuit between two foreign parties litigated in a foreign forum. *See Lacey,* 932 F.2d at 187. Even assuming that Guatemalan law was applicable to this case, it is not even clear that the assertions made concerning the difficulties of recovery are a correct statement of Guatemalan law. *See, e.g., Guatemala Law Digest, in* Martindale–Hubbell, *International Law Digests* at GUA–3 (1992) (stating that Guatemalan law generally allows some recovery for personal injury). The application pursuant to New Jersey Court Rule 1:21–7(f) is therefore denied. The Court concludes that $225,000 is the maximum appropriate fee in this case.

### 2. *Apportioning the Maximum Appropriate Fee*

The Court must now decide what portion of the maximum appropriate fee, if any, should be paid to Mr. Keith and to Bross, Strickland, respectively. The pivotal issue at this juncture is whether the parties, by their conduct, have forfeited the fees to which they would be entitled under the contingent fee and referral fee agreements. The Court will separately examine the conduct of Mr. Keith

and Mr. Bross in light of all the circumstances surrounding the litigation.

### a. *Mr. Keith's Fee*

 As to Mr. Keith, the examination is uncomplicated. Under the referral fee agreement, Bross, Strickland agreed to pay him and he agreed to accept a one-third referral fee. While the Court will enforce this agreement, the Court concludes that Mr. Keith's referral fee will be forfeited to the estate as a result of his breach of his duty of loyalty to the estate. As discussed above, Mr. Keith breached this duty by placing himself in a conflict of interest position throughout the instant litigation by agreeing to accept a portion of the fee earned by the lawyer he was duty bound to supervise. The breach was compounded by Mr. Keith's rendering of an opinion as to the fairness of the settlement agreement and the requested fee while failing to inform the Court that he was in a position to receive a portion of the fee.[39] A further breach was occasioned by Mr. Keith's endorsement of Bross, Strickland's application for an enhanced fee, an enhancement that would have resulted in the diversion of funds from the estate to Mr. Keith's own pocket. The words of Justice Cardozo, then a member of the New York Court of Appeals, concerning a fiduciary's duty remain just as apt today as when they were written more than sixty years ago:

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions.

---

**39.** At the February hearing, counsel for Bross, Strickland asserted that the Court's question concerning any referral fee agreements had been answered candidly, and had been answered before the matter concluded. *See* Tr. of Hrg. on 2/15/94, at 19. This, however, is insufficient. Is it this Court's burden, in exercising its authority

to protect the rights of an incompetent, to ask every possible question during the course of an *ex parte* hearing on a motion to approve settlement? Mr. Keith, whether acting as lawyer, guardian, or both, had an obligation during the course of these proceedings to inform the Court of his compromised position.

Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.

*Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 546 (1928) (citation omitted). This rule of ancient vintage, grounded on the crucible of human experience, will not be disregarded by this Court either.

▉▉▉▉ A fiduciary who profits from his position must disgorge to the estate any benefits that are actually received. *See Rothenberg v. Franklin Washington Trust Co.,* 133 N.J.Eq. 261, 31 A.2d 831, 832 (1943); *Silverstein,* 383 A.2d at 723; IIA Scott & Fratcher, *supra,* § 170.22. Although application of this rule may seem harsh, only the certainty that forfeiture of the ill-gotten gains will follow detection of the breach will serve the prophylactic purpose of the rule. Therefore, Mr. Keith's portion of the legal fees, $75,000, which represent the fruits of his breach of duty, and which Bross, Strickland had agreed to pay him under the referral fee agreement, will be forfeited to the estate.[40] Given his misconduct, he will not be permitted to recover for *any* services he may have performed in connection with this litigation.[41] Furthermore, for the same reasons as discussed *infra* in regards to Mr. Bross, he will be referred to the New Jersey Superior Court for possible referral to the New Jersey Supreme Court Office of Attorney Ethics.

### b. *Bross, Strickland's Fee*

▉▉▉▉ Bross, Strickland, in the person of Mr. Bross, stands on a slightly different footing than does Mr. Keith. While the Court will recognize and enforce for purposes of this settlement the terms of the contingent fee and referral fee agreements, and will not examine Mr. Bross's role in helping to navigate the appointment of Mr. Keith by the New Jersey Superior Court as the guardian of the estate, the Court does not validate the conduct either. Though the Court could well conclude that these actions and agreements were inimical to the interests of justice, because they occurred in New Jersey prior to the filing of the instant law suit and in the course of the retention of a New Jersey lawyer to represent a New Jersey guardian who was to act on behalf of an incompetent domiciled in New Jersey, and because they call upon the application of New Jersey Court Rules, the Court will defer to the New Jersey Superior Court with overall superintendency over the estate on the issue of what portion of the maximum appropriate fee, if any, should be awarded to Bross, Strickland. Bross, Strickland, in fact, has agreed that the New Jersey court is the proper forum for the resolution of this issue. *See* Bross Response at 14–15.

▉▉▉▉ The Court does sit in judgment on Mr. Bross's activities in this Court, specifically, his silent acquiescence to Mr. Keith's statement to the Court concerning the fairness of the settlement, and to Mr. Keith's endorsement of the request for an enhanced fee, at the time Mr. Bross *knew* of Mr. Keith's compromised position. Though the Court does not find that Mr. Bross violated any fiduciary duty to the estate, *but see* IV Scott & Fratcher, *supra,* § 326.4 (discussing an attorney's liability to a beneficiary for colluding with a trustee in a breach of fiduciary duty), the Court concludes that Mr. Bross's conduct constituted a breach of his duty of candor towards this tribunal.

---

**40.** The Court rejects the contention of Bross, Strickland's counsel that the effect of this decision is the payment of a referral fee by Bross, Strickland to the estate. *See* Tr. of Hrg. on 2/15/94, at 38. The $75,000 referral fee is considered paid to Mr. Keith, and subsequently forfeited to the estate. Bross, Strickland's fee in this case, as set by the Court, is $150,000. There is no penalty being applied since Bross, Strickland could not have anticipated receiving any more than this amount, barring a successful application under 1:21–7(f), given its agreement to pay Mr. Keith a referral fee, an agreement it presumably entered into in the good-faith belief that it would be legitimate. If the New Jersey Superior Court were to eventually reject the referral agreement, Bross, Strickland would be unjustly enriched.

**41.** Although a guardian who performs legal services for an estate is entitled to petition for compensation, *see* N.J.Stat.Ann. § 3B:18–6 (West 1983), it would be inequitable to allow a guardian who has breached his duty of loyalty to recover, whether for work performed as a lawyer or as a guardian.

■ Rule 3.3(d) of the Pennsylvania Rules of Professional Conduct provides as follows:

> In an *ex parte* proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse.

There is no doubt that the instant proceedings were *ex parte* in that, though the defendants were technically parties to them, they had no adversarial interest in opposing Bross, Strickland's fee request. Candor to the Court, though desirable under any circumstance, is mandated in *ex parte* proceedings, where the Court is deprived of the benefits of the "dialectic of the adversary system." 1 Geoffrey C. Hazard & W. William Hodes, *The Law of Lawyering* § 3.3:501, at 619 (2d ed. 1993). Under Rule 3.3(d), a lawyer engaged in an *ex parte* hearing must "inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse." Pa. R.P.C. 3.3(d); *cf. Fitzhugh v. Committee on Professional Conduct*, 308 Ark. 313, 823 S.W.2d 896 (1992) (discussing similar provision); *In re Norton*, 128 N.J. 520, 608 A.2d 328 (1992) (*per curiam*) (same); *see also* Local R.Civ.P. 14 (Rule VIII) (stating that an attorney appearing *pro hac vice* submits to the rules of this Court, which include by incorporation the Pennsylvania Rules of Professional Conduct).

■ Even beyond the requirements of Rule 3.3(d), an attorney, as an officer of the Court, has an overarching duty of candor to the Court. *See Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1546 (11th Cir.1993); *Beam v. IPCO Corp.*, 838 F.2d 242, 249 (7th Cir.1988); *United States v. Associated Convalescent Enters., Inc.*, 766 F.2d 1342, 1346 (9th Cir.1985); *Itel Containers Int'l Corp. v. Puerto Rico Marine Management, Inc.*, 108 F.R.D. 96, 104 (D.N.J.1985); *Virzi v. Grand Trunk Warehouse & Cold Storage Co.*, 571 F.Supp. 507, 512 (E.D.Mich.1983). As recently described by the Fourth Circuit Court of Appeals, this duty is founded on the preservation of the integrity of the judicial process:

Our adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the system's process which is designed for the purpose of dispensing justice. However, because no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent and custom, and argument to reasoned conclusions—all directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition. Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process. . . .

While no one would want to disagree with these generalities about the obvious, it is important to reaffirm, on a general basis, the principle that lawyers, who serve as officers of the court, have the first line task of assuring the integrity of the process. . . . The system can provide no harbor for clever devices to divert the search, mislead opposing counsel or the court, or cover up that which is necessary for justice in the end. It is without note, therefore, that we recognize that the lawyer's duties to maintain the confidences of a client and advocate vigorously are trumped ultimately by a duty to guard against the corruption that justice will be dispensed on an act of deceit.

*United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457–58 (4th Cir.1993).

Given the *ex parte* nature of the hearing, the Court holds that Mr. Bross's silence was inexcusable. The Court was led to believe, if only tacitly, that it was being assisted in its decisionmaking by a disinterested guardian, when Mr. Bross *knew* that such was not the case. The Court concludes that Mr. Bross, while under a duty to do so, failed to speak the unvarnished truth.

The breach of the duty of candor was further aggravated by counsel's discombobulated performance in presenting the fee application to the Court. Counsel failed to file initially a formal motion for approval; misrepresented that the fee requested was in accordance with the New Jersey rules; failed to cite to relevant New Jersey case law on

the interpretation of New Jersey Court Rule 1:21–7(c)(5); and miscited *McCombs v. New Jersey State Police. See supra* at 784–86. Though these missteps in isolation could be overlooked, viewed as links in a chain, they leave the Court with the clear and distinct impression that Mr. Bross did not play fair with the Court. Given the late hour in the litigation, all that the Court can do is note the infractions and take the appropriate measures. *See Webb v. E.I. Du Pont de Nemours & Co.*, 811 F.Supp. 158, 160 (D.Del. 1992).

Bross, Strickland argues that Mr. Bross's failure to disclose Mr. Keith's financial interest was not a violation of Rule 3.3(d) because the interest was not a material fact, i.e., because it was not " 'important enough to affect the outcome of a case.' " Bross Response at 33 (quoting *Webster's New World Dictionary* 874 (2d College ed. 1980)). The Court will not trivialize the violation. If the conflict created by Mr. Keith's financial interest had been disclosed at an earlier point, the Court would have considered appointing a guardian ad litem to conduct this litigation. *See* Fed.R.Civ.P. 17(c); *see, e.g., Gardner by Gardner*, 874 F.2d at 138; *Ad Hoc Comm. of Concerned Teachers*, 873 F.2d at 30–31; *Hoffert*, 656 F.2d at 164. Counsel cannot change the materiality of a fact by failing to disclose it until the last minute, thereby attempting to render it immaterial in the face of competing concerns, e.g., Ms. Eagan's need for money. Counsel had an obligation to disclose the conflict early on in the litigation, maybe even at the inception, at a point when the Court could have made a timely analysis under Rule 17(c) of the propriety of Mr. Keith's representation of the estate in this case.

■ The Court concludes that under the circumstances, the most appropriate course of action is to revoke Mr. Bross's *pro hac vice* admission. Though the Court finds that his conduct rose to a level that may be considered a breach of the Rules of Professional Conduct, it is not this Court's function to adjudge whether or not Mr. Bross's conduct should result in some manner of professional discipline. That determination is properly reserved to the appropriate disciplinary body. *See, e.g., Greenfield v. U.S. Healthcare, Inc.*, Civ.A. No. 92–6345, 1993

WL 106453, at *2 (E.D.Pa. Apr. 6, 1993) ("[T]he inquiry, adjudication, and determination of allegations of ethical misconduct are matters for the Disciplinary Board of the Supreme Court of Pennsylvania."). In this case, given that this matter is being referred to the New Jersey Superior Court for further proceedings, and given counsel's *pro hac vice* status, the Court finds that referral to the Disciplinary Board of the Supreme Court of Pennsylvania is unwarranted. That said, the Court is not without recourse to require adherence to the Court's disciplinary rules from attorneys appearing *pro hac vice*. "At a minimum, a violation of any disciplinary standard applicable to members of the bar of the court would justify revocation of *pro hac vice* status." *Johnson v. Trueblood*, 629 F.2d 302, 304 (3d Cir.1980) *(per curiam ).*

■ The Third Circuit requires that before this Court revokes a *pro hac vice* admission, counsel must be provided with "notice of the conduct placing his or her *pro hac vice* status at risk, notice of the standard the ... court will apply in deciding whether to revoke that status, an opportunity to respond, and written reasons for any revocation." *Taberer v. Armstrong World Indus., Inc.*, 954 F.2d 888, 910 (3d Cir.1992); *see Johnson*, 629 F.2d at 303–04 (establishing the supervisory rule). Though the Court's Order to Show Cause did not specify revocation of *pro hac vice* status as an envisioned course of action, the Order did provide Mr. Bross with notice of the conduct troubling the Court, specifically, that his breach of the duty of candor was at issue, and did in fact intimate that a harsher sanction than what is proposed here was possible, i.e., referral to the New Jersey Supreme Court Office of Attorney Ethics and reduction of the contingent fee to quantum meruit. Mr. Bross was given an opportunity to be heard and to present evidence at a hearing, where he was represented by distinguished Pennsylvania counsel. The Court finds that the Order to Show Cause and the subsequent hearing satisfied the procedural requirements under the supervisory rule established in *Johnson,* and, for the reasons heretofore stated, will revoke the *pro hac vice* admission granted to Mr. Bross on March 18, 1992.

To sum up, Mr. Keith is entitled to $75,000 under the referral fee agreement, but due to

his breach of the duty of loyalty, the fee is forfeited to the estate. Bross, Strickland is entitled to a fee up to a maximum of $150,-000, subject to approval by the New Jersey court. Mr. Bross's *pro hac vice* admission is revoked.

## III. CONCLUSION

Ms. Eagan has suffered greatly from her injuries. The settlement of this case cannot truly recompense her, nor can it restore her to her former self. Though Messrs. Bross and Keith have reached a settlement that, under the circumstances, the Court has concluded is fair and reasonable, the Court is greatly troubled by their conduct in this case. "The court has the right to rely upon the integrity of its officers. The legal profession is a confidential one, with a double duty upon its members, viz., utmost good faith toward both client and court." *In re Wolk*, 82 N.J. 326, 413 A.2d 317, 319 (1980) (*per curiam*). Though the Court has no reason to doubt that Messrs. Bross and Keith are recognized as upright and respectable members of the bar, their conduct in this case falls below the level of professionalism the Court is entitled to expect from those licensed to practice before it. Mr. Bross helped put Mr. Keith in a compromised position, a position that Mr. Keith readily accepted, and both of them omitted that fact when they appeared before the Court to make what was essentially a joint fee petition. Mr. Keith shall receive no fee for his tainted efforts, and while the Court has determined the maximum appropriate fee that Bross, Strickland may collect, the actual fee will ultimately depend upon the New Jersey Superior Court's judgment of the propriety of their efforts. This determination is consistent with the avowed intention of Messrs. Bross and Keith that "Sharon's welfare [is] of primary importance." Second Bross Aff. ¶ 14. In conclusion, the Court finds:

1. Settlement of the case by payment to the estate of $1.2 million is fair and reasonable;

2. Under the contingency fee agreement the maximum appropriate legal fee (the "Appropriate Fee") in this case is $225,000. Under the circumstances of this case, this amount is permissible under New Jersey Court Rules;

3. Bross, Strickland is entitled to receive up to $150,000 as an appropriate fee. Whether Bross, Strickland and Mr. Bross's conduct in initially entering into an oral contingent fee agreement, promising to pay Mr. Keith a one-third referral fee, and appearing as counsel in the incompetency proceedings, and thereafter undertaking the representation of the estate in this litigation, without disclosing to the New Jersey Superior Court the existence of a referral fee agreement with Mr. Keith, violated the New Jersey Court Rules and/or the New Jersey Rules of Professional Conduct or other applicable New Jersey statutes or rules, shall be referred to the New Jersey Superior Court with general superintendency upon the administration of the estate. The New Jersey Superior Court shall determine what portion, if any, of the $150,000 shall be forfeited to the estate, or otherwise approved for payment to Bross, Strickland;

4. Mr. Bross's conduct during the course of the litigation breached his duty of candor to the tribunal. Mr. Bross's *pro hac vice* admission will therefore be revoked;

5. Under the referral fee agreement, Mr. Keith is entitled to $75,000, or one-third of the appropriate fee. Mr. Keith's conduct during the litigation in this Court breached his fiduciary duty to the estate. Mr. Keith shall therefore forfeit to the estate the referral fee he agreed to accept from Bross, Strickland (amounting to one-third of the Appropriate Fee). Mr. Keith shall also be referred to the New Jersey Superior Court for the same reasons as Bross, Strickland and Mr. Bross, i.e., actions taken as an attorney prior to the institution of the instant case; and

6. The recovery shall be allocated as follows:

| | | |
|---|---|---|
| $ | 600,000 | Purchase of an annuity from Prudential Insurance Company of America |
| $ | 16,482 | Litigation Expenses, payable to Bross, Strickland |
| $ | 150,000 | Attorney's fees, payable to Bross, Strickland, subject to approval by the N.J. Superior Court |
| $ | 0 | Referral fee payable to Eugene Keith |
| $ | 330,114.40 | Medical Bills |
| $ | 103,703.60 | Remainder to the estate of Sharon Eagan |
| TOTAL | $1,200,000.00 | |

An appropriate order shall be entered.

## ORDER

AND NOW, this 13th day of June, 1994, for the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that:

1. Settlement of the case by payment to the estate of $1.2 million is approved;

2. The appropriate legal fee in this case is $225,000;

3. Mr. Eugene Keith is entitled to $75,000. This amount is forfeited to the estate of Sharon Eagan;

4. Bross, Strickland, Cary & Grossman, P.A., is entitled to receive up to $150,000. No monies shall be disbursed, however, without the permission of the New Jersey Superior Court with general superintendency upon the administration of the estate;

5. The *pro hac vice* admission of Mr. Sheldon Bross, Esq., counsel for the estate in this litigation, is revoked;

6. The Clerk of the Court shall send a copy of this Order and accompanying Memorandum to the clerk of the New Jersey Superior Court in Essex County, New Jersey, with a request that it be filed of record in the case captioned *In the Matter of the Guardianship of Sharon Eagan,* Essex County Surrogate's Court Docket No. 13,447–Y. The Clerk shall also send a copy to the chambers of the Honorable Harry Margolis, Presiding Judge of the Chancery Division, Essex County, New Jersey, and a copy to Mr. Joseph Bottitta, Esq.;

7. The $1.2 million recovery shall be allocated and distribution shall be made as follows:

| | |
|---|---|
| $ 600,000 | Purchase of an annuity from Prudential Insurance Company of America |
| $ 16,482 | Litigation Expenses, payable to Bross, Strickland, Cary & Grossman, P.A. |
| $ 150,000 | Attorney's fees, payable to Bross, Strickland, subject to approval by the N.J. Superior Court |
| $ 0 | Referral fee payable to Eugene Keith |
| $ 330,114.40 | Medical Bills |
| $ 103,703.60 | Remainder to the estate of Sharon Eagan |
| TOTAL $1,200,000.00 | |

8. The case shall be marked **CLOSED.**

AND IT IS SO ORDERED.